Lucille SODERGREN, Plaintiff,

v.

Paul GOODMAN and Benny Frank
McElyer, Defendants.

Civ. A. No. AC–1079.

United States District Court
E. D. South Carolina,
Columbia Division.

June 4, 1965.

Henry H. Edens, Henry Hammer, Columbia, S. C., for plaintiff.

Claude M. Scarborough, Jr., Nelson, Mullins, Grier & Scarborough, Columbia, S. C., for defendant.

SIMONS, District Judge.

This is an action for personal injuries and property damage allegedly sustained by plaintiff as a result of a collision between plaintiff's 1957 Chevrolet automobile and a 1961 Mack tractor and trailer operated by defendant Benny Frank McElyer, agent and employee of Warwick Laboratories, Inc. Defendant Paul Goodman, owner of the subject tractor and trailer, had leased the vehicle to Warwick Laboratories at the time of the accident; [1] and by terms of the lease Warwick assumed all liability for the operation of the vehicle. Upon motion of counsel for defense, non-suit as to defendant Goodman was granted at the close of defendants' case.

The complaint alleges that, on or about May 14, 1962, plaintiff had stopped her vehicle a safe distance behind defendant McElyer's tractor and trailer on S. C. State Highway No. 48; and that defendant proceeded to back his tractor and trailer upon the highway in a negligent, careless, reckless, wilful and wanton manner, causing it to collide with plaintiff's automobile, thereby causing plaintiff to sustain personal injuries and property damage to her automobile.

In their answer, defendants generally denied all of the material allegations of plaintiff's complaint.

The case was tried before me without a jury, March 8, 1965, in Columbia, S. C.

1. See defendant's exhibit # 1, Lease Agreement with Warwick Laboratories.

I find the facts specially and state my conclusions of law thereon in accordance with Rule 52[a] of the Federal Rules of Civil Procedure, as follows:

## FINDINGS OF FACT

1. On May 14, 1962, at approximately 11:00 a.m., plaintiff was proceeding in her 1957 Chevrolet automobile in a southerly direction along State Highway 48, commonly known as Bluff Road, near the city of Columbia, in a careful and prudent manner. She was following a tractor and trailer loaded with produce, which was also proceeding along Bluff Road in a southerly direction, and which was being operated at the time by defendant Benny Frank McElyer, agent and employee of Warwick Laboratories, Inc., who at all times herein was acting within the course and scope of his employment. Defendant was headed into the State Farmer's Market, and after he had inadvertently driven by the entrance to same, which was located on his right, he stopped the tractor and trailer on the traveled portion of the highway, in its outside or curb lane a short distance beyond the entrance to said market, plaintiff thereupon stopped her car some 3 or 4 car lengths behind the truck, rather than attempting to pass the truck on the left because of other traffic.

2. While plaintiff's automobile was stopped in a safe and prudent manner behind the tractor and trailer, defendant McElyer proceeded to back the unit upon the highway, without any warning and without first exercising due care [2] to ascertain that there were no vehicles behind him, so as to be in position to turn into the entrance of the Farmer's Market. As he backed his tractor and trailer, he did not see plaintiff's vehicle stopped on the highway behind him, and backed into the front of the car, causing extensive damage to the automobile and inflicting serious personal injuries upon plaintiff.

3. Plaintiff sounded her horn when she observed the truck backing toward her and attempted to put her car in reverse, but defendant did not hear the horn and proceeded backward for 15 or 20 feet until he collided with plaintiff's automobile. Plaintiff had no opportunity to move her car to avoid the collision.

4. Bluff Road at the location of the accident is a heavily traveled four lane highway. The area where the collision took place is well developed and very congested. At this location the roadway is level and view of the highway in all directions is unobstructed. At the time of the accident the weather was clear, and visibility good.

5. As a result of the collision plaintiff's car was damaged in the amount of $276.42. She was also deprived of the use of same for a period of 23 days, during which period she rented another car at the rate of $7.00 per day for a total rental of $161.00.

6. In the afternoon following the accident plaintiff was examined by a doctor who found her to be suffering from general body soreness, muscle spasms of the neck, extreme tenderness and soreness of neck muscles and severe headaches. Her condition was diagnosed at that time as a hyper-extension injury of the neck.[3] There is also evidence that plaintiff has developed cervical neuritis between the 4th and 5th vertebrae, resulting from the tearing and stretching of the ligaments in the neck and back. She has experienced arthritic changes of the spine in this area since the date of the collision. Plaintiff has been required to seek medical attention and continues to suffer pain some three years after the accident. Her condition has not improved as rapidly as originally believed by her doctors. The preponderance of medical testimony shows that she has sustained permanent injuries to her neck, will continue to ex-

---

2. Defendant McElyer testified that he and his passenger looked in the rear view mirror before backing to insure that the road was clear, and did not see plaintiff's car.

3. At the trial, Dr. Wm. Ledyard, a neurosurgeon testified that plaintiff probably suffered an extension-flexion of the cervical spine, commonly known as "whiplash".

perience pain and discomfort for an indefinite period in the future, and will continue to require medical treatment and medicines to alleviate the pain.

In February, 1963, plaintiff was hospitalized for a period of 10 days during which time she had her neck placed in traction and she received diathermy treatments. Upon release from hospital plaintiff took muscle relaxants and medication for pain. In May, 1963, she was examined by a neurosurgeon and advised to continue neck traction at home and to wear a cervical collar brace during the day. She continued to require drugs for pain and discomfort. In September, 1963, she was again hospitalized for 11 days and underwent a myelogram procedure with negative results. She developed post-spinal headaches following the myelogram. Following her release from hospital, traction was discontinued but plaintiff was advised to continue use of heat treatments and cervical collar. She still continues to wear the collar intermittently, and still suffers pain in her neck and shoulder, headaches and nausea.

7. As a result of her said injuries, she has undergone a marked change of personality. At the time of the accident she was a carefree, happy, attractive, single woman, 35 years of age, who enjoyed participating in various sports activities, especially bowling, who enjoyed "going out" with friends on pleasant excursions, and who was the "life of the party." Since the accident, plaintiff is often depressed, cries frequently, does not enjoy the company of friends as she did prior to the collision, and seldom wants to go out at night. Although her doctors have recommended that she curtail her bowling and other strenuous activities, she continues to bowl regularly. Her average has dropped considerably, and her bowling companions have noted a decided change in her attitude and stamina.

8. Plaintiff, who is entirely dependent upon her earned income for support, completed a course in cosmetology in 1957, and was thereafter employed as a hair dresser for the ensuing 3½ years.

In November, 1961, she opened her own beauty shop. In January, 1963, she sold her business because the pain and discomfort she suffered as a result of her said injuries made it impossible for her to continue to do the amount of work required, and she was physically unable to devote sufficient time and effort at her shop to make it a success. She earned an average of $50.00 per week during this period. Following the sale of her shop plaintiff again worked on a commission basis in various salons. She is still employed on this basis and earns approximately $4000 per year. Prior to the accident she averaged approximately $4200 to $4700 per year in earnings. Prior to the accident she served 20 to 25 customers per day, devoting an average of 15 minutes per customer. Since the accident she tires quickly and is only able to serve about 12 to 14 customers per day, but retains higher percentage of charges due to increased proficiency and experience. Testimony of a reliable witness indicates that an average operator of plaintiff's training, experience and ability can handle 20 to 30 customers per day and averages earnings in commissions $7000 to $9000 per year, although from the record before me, it appears that plaintiff has never actually earned such sums. The evidence as to plaintiff's average earnings prior to the accident and her earnings since the accident is not very definite and is somewhat speculative, in that it is not supported by any documentary evidence of earnings, tax returns or withholding statements. However, I do find from the evidence presented that plaintiff's highest average earnings have been in the neighborhood of $4500 to $4700 annually, and that since the accident she has earned somewhat less than this amount.

9. I further find from the medical testimony that her injuries are of a permanent nature; that she most probably will continue to suffer intermittent pain and discomfort in the future, and that her earning capacity has been permanently reduced. Her work as a cosmetologist requires her to remain on her

feet for extended periods, involves extensive use of her arms and shoulders and requires her to keep her hands and arms in an extended and raised position over long periods of time. Such strenuous activity has undoubtedly tended to aggravate plaintiff's condition and increase her pain and discomfort.

10. Her doctors have advised her to shorten her working hours and to consider some type of employment less strenuous than that of a beautician. In line with this advice during September, 1964, she enrolled in an IBM operator's night course of study which she attends two nights per week in an attempt to train herself for another type of employment which will involve less strenuous work. The beginning wage for an inexperienced IBM operator is $1.25 per hour, 40 hours per week, for an annual earning of approximately $2600. Thus, if plaintiff should change over into this type of work it would take her a considerable length of time before her earnings would be comparable to that which she has earned as a beauty parlor operator.

11. As a result of her said injuries plaintiff has been made to suffer severe physical pain and mental anguish; she has been made to miss time from her employment and her earnings have been reduced. She has also been required to expend for doctors', hospital, and medical bills a total sum of $1,083.58.

12. Plaintiff has suffered permanent injuries, her earning capacity has been permanently impaired, and she will be caused to suffer pain and discomfort in the future and to incur future doctors' and medical expenses. At the time of the accident she was 34 years of age and had a life expectancy of 37.60 years under the South Carolina Mortuary Table.[4]

13. As a result of her said injuries plaintiff has suffered actual damages in the total sum of $10,500.00.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and of the subject matter of this action.

2. The rights and duties of the parties are governed by the laws of the State of South Carolina, the place where the collision occurred.

■ 3. Defendant Benny Frank McElyer, in the operation of his tractor and trailer upon the occasion in question, was guilty of actionable negligence by his failure to exercise due care in the operation of said vehicle as required by the common law rules of the road and the statutory laws of the State of South Carolina: [a] By backing a large and heavily loaded Mack tractor and trailer upon a busy four-lane highway in violation of Section 46–492 of the 1962 South Carolina Code of Laws;[5] [b] by failing to keep a proper lookout;[6] [c] by failing to have his vehicle under proper control; and [d] by failing to give any warning or signal of his intention to back said truck upon the heavily traveled highway on said occasion.

■ 4. Defendant's violation of Section 46–492 constitutes negligence per se. Chesser v. Taylor, 232 S.C. 46, 100 S.E.2d 540 [1957]; Green v. Sparks, 232 S.C. 414, 102 S.E.2d 435 [1958].

5. Plaintiff was not guilty of any acts of negligence in the operation of her automobile upon the occasion in question which concurred or contributed in any manner to the injuries and damages suffered by her in the collision.

6. Defendant's negligent acts were the sole proximate cause of the collision and the resulting injuries and damages to

---

4. Section 26–12, South Carolina Code of Laws [1962] as amended.

5. Section 46–492 provides: "Limitations on backing.—The driver of a vehicle shall not back it unless such movement can be made with reasonable safety and without interfering with other traffic."

6. It is noted that one Johnny Adams was a passenger in defendant's truck at the time of the collision and should reasonably have been required to dismount from the truck to determine that the backing operation could be "made with reasonable safety and without interfering with other traffic."

the plaintiff, without which they would not have occurred.

■ Based upon the foregoing findings of fact and conclusions of law, it is my opinion that plaintiff is entitled to recover judgment against defendant, Benny Frank McElyer in the total sum of $10,500.00 as actual damages, and it is so ordered.

Let judgment be entered accordingly.